

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-20-1996

# Appalachian States v. Secretary Energy

Precedential or Non-Precedential:

Docket 95-7382

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Appalachian States v. Secretary Energy" (1996). *1996 Decisions.* Paper 89.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/89

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 95-7382


APPALACHIAN STATES LOW-LEVEL
RADIOACTIVE WASTE COMMISSION

v.

HON. HAZEL O'LEARY, in her official
capacity as Secretary of Energy,

Appellant.


On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil Action No. 94-cv-01033)


Argued February 9, 1996

Before: BECKER, ROTH and MCKEE, Circuit Judges

(Opinion Filed August 20, 1996)

Frank W. Hunger
Assistant Attorney General
David M. Barasch
United States Attorney
Mark B. Stern
Michael S. Raab (Argued)
Assistant United States Attorneys
United States Department of Justice
Civil Division, Room 3127
10th & Pennsylvania Avenue, N.W.
Washington, DC  20530

Mary C. Frye
Assistant United States Attorney
Office of the United States Attorney
Federal Building
228 Walnut Street
P.O. Box 11754
Harrisburg, PA 17108

       Attorneys for Appellant

John W. Carroll, Esq. (Argued)
Timothy B. Anderson, Esq.
Brian P. Downey, Esq.
Pepper, Hamilton & Scheetz
200 One Keystone Plaza
North Front and Market Streets
P.O. Box 1181
Harrisburg, PA  17108-1181

David Richman, Esq.
Pepper, Hamilton & Scheetz
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA  19103-2799

       Attorneys for Appellee

Michael F. Healy, Esq.
Donald J. Silverman, Esq.
Sang Y. Paek, Esq.
Morgan, Lewis & Bockius
1800 M Street, N.W.
Washington, DC  20036

       Attorneys for Amicus-Appellant

Scott Harshbarger
Attorney General
Commonwealth of Massachusetts
Kristin McIntosh, Esq.
William W. Porter, Esq.
Thomas A. Barnico, Esq.
Assistant Attorneys General
Commonwealth of Massachusetts
One Ashburton Place, Room 2019
Boston, MA  02108

       Attorneys for Amicus-Appellee

OPINION OF THE COURT

ROTH, Circuit Judge:

In this appeal, we must evaluate the Secretary of Labor's interpretation of the Low-Level Radioactive Waste Policy Amendments Act of 1985 ("LLRW Act"), 42 U.S.C. §§ 2021a-2021j, under the standard set forth in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). We hold that the Secretary's interpretation was a permissible reading of an ambiguous statute and is properly accorded deference. We will therefore reverse the district court's decision and enter judgment for the Secretary.

I.

This case revolves around Congress's efforts to address the nation's problems with the disposal of low-level radioactive waste ("LLRW") and the Secretary of Energy's ("Secretary") attempts to implement Congress's legislated solution. Much of the background to this dispute is described in New York v. United States, 505 U.S. 144 (1992), in which the U.S. Supreme Court held unconstitutional the LLRW Act's requirement that states which were not in compliance with the Act after January 1, 1993, take title to their waste. 42 U.S.C. § 2021e(d)(2)(C)(i). The Court held the take-title provision severable; the balance of the Act remains in effect.

The LLRW saga began in the 1970s when six commercial LLRW disposal sites were operating in the United States. By 1979, three of the facilities had closed permanently, and the states where the three remaining facilities were located had announced plans to shut down or to severely limit access to their sites. The nation faced a substantial risk that thousands of LLRW generators -- such as hospitals, research institutions, universities, manufacturers, industrial facilities, and nuclear power plants -- would have nowhere to dispose of their waste. New York, 505 U.S. at 149-50.

Congress responded to this crisis by passing the Low-Level Radioactive Waste Policy Act of 1980, Pub. L. No. 96-573, 94 Stat. 3347 (1980). This largely hortatory enactment authorized states to form regional compacts that would cooperate to plan, construct, and operate new LLRW disposal sites. The 1980 Act authorized the regional compacts to exclude waste generated outside their regions beginning on January 1, 1986. As that date approached, it became apparent that no new facilities had been built. The nation faced a renewed LLRW crisis, accentuated by the fact that those regional compacts containing the three existing facilities could now exclude waste from the remaining states. New York, 505 U.S. at 151.

Congress reacted by passing new legislation. The Low-Level Radioactive Waste Policy Amendments Act of 1985, 42 U.S.C. §§ 2021a-2021j, created a revised set of deadlines and added a variety of incentives and penalties to the formerly toothless scheme. The goal of the program remained the construction of new disposal sites. The new system of incentives and penalties was designed to spur construction. The deadlines included a series of milestones by which states had to submit plans, issue progress reports, and eventually complete licensing applications for new LLRW sites. States could also comply with the statute's requirements by forming regional compacts in which one state would build the requisite facility and the others would contract for waste disposal. The incentives included an escalating scale of surcharges, which states with sites could charge for LLRW waste disposal and a rebate system to return a portion of those surcharges to states that met the relevant milestones. States that failed to meet the milestones would forfeit these rebates, would face higher surcharge rates, and could be barred from disposing of their waste at a given facility.

The various statutory milestones followed a natural progression toward full disposal. By July 1, 1986, "each non-member State" had to manifest an "intent to develop a site for the location of a [LLRW] disposal facility within such State." 42 U.S.C. § 2021e(e)(1)(A). By January 1, 1988, each non-sited region had to identify the state that would contain the LLRW facility and develop a detailed siting plan for establishing the facility. Id. § 2021e(e)(1)(B). By January 1, 1990, each non-sited compact region and each non-member state had to furnish a complete application for licensing the LLRW facility. Alternatively, any state without a facility could provide "written certification . . . that such State will be capable of providing for, and will provide for, the storage, disposal, or management of any [LLRW] waste generated within such State and requiring disposal after December 31, 1992 . . .." Id. § 2021e(e)(1)(C). The fourth and final milestone provided for reimbursement only if "by January 1, 1993, the State . . . is able to provide for the disposal of all [LLRW] generated within such State or compact region." Id. § 2021e(d)(2)(B)(iv).

To comply with the LLRW Act, the states of Pennsylvania, Delaware, Maryland, and West Virginia formed the Appalachian States Low-Level Radioactive Waste Compact, governed by the plaintiff-appellee Appalachian States Low-Level Radioactive Waste Commission ("Commission"). Congress approved this compact on May 19, 1988. Pub. L. No. 100-319, 102 Stat. 471 (1988). The record indicates that the Commission met the first three statutory milestones.

This dispute turns on the fourth milestone. On December 1, 1992, the Commission entered an eighteen-month conditional contract with the Southeast Compact to obtain access to the disposal facility in Barnwell, South Carolina, one of the three sites that had been in existence when the original 1980 Act was passed. The contract was not renewed, and the Commission does not have a contract with any other compact region or state for the disposal of LLRW. Nevertheless, this contract was in

effect on January 1, 1993, the date by which a state had to be able to dispose of "all" LLRW to meet the fourth milestone and qualify for a rebate.

On February 11, 1993, the Commission sent a letter to the Department of Energy claiming that it had satisfied the requirements of the LLRW Act and was therefore eligible for a full 1993 rebate. On March 21, 1994, the Secretary published her interpretation of the statute, clarifying the criteria for the 1993 rebate. She explained that a full 1993 rebate would be given only to those states that had provided for disposal of all their waste for the entire three-year period from January 1, 1993, until January 1, 1996. States that only provided for disposal for shorter periods would have their rebates reduced proportionately. This interpretation was based on the Secretary's reading of the statute as a whole, relying particularly on the related provision in § 2021e(d)(2)(C) that established the consequences of failing to meet the 1993 milestone. On April 22, 1994, the Commission renewed its request for a full 1993 rebate. On September 1, 1994, pursuant to its final policy and procedures, the Secretary paid the Commission one half of the maximum rebate, plus interest. This amount was based on the Commission's eighteen-month contract, which provided for waste disposal for half of the three-year period.

The Commission responded by filing suit in the U.S. District Court for the Middle District of Pennsylvania, seeking a writ of mandamus to compel the Secretary to pay the full rebate. Both sides moved for summary judgment. Ostensibly applying Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), the district court held that (1) the statute was ambiguous, but that (2) the Secretary had failed to adopt a reasonable reading of the LLRW Act. See Appalachian States Low-Level Radioactive Waste Comm'n v. O'Leary, Civ. No. 3:CV-94-1033, slip op. at 16 (M.D. Pa. May 22, 1995) (hereinafter District Court Op.). The Secretary appealed.

II.

The district court had jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and § 1361 ("original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to plaintiff"). We exercise appellate jurisdiction over the district court's final order pursuant to 28 U.S.C. § 1291.

III.

In exercising plenary review over the district court's grant of summary judgment, we must apply the standard that the district court should have used initially. Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976), cert. denied, 429 U.S. 1038 (1977). Accordingly, the central issue before us is whether the Secretary's action meets the test set forth in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). We conclude that, in interpreting the LLRW Act, the Secretary adopted a permissible reading of an ambiguous statute. The district court, by contrast, held the statute ambiguous, but then went on to reject the Secretary's

interpretation.  We will reverse the decision of the district court.

Where Congress has entrusted a federal agency with the administration of a statutory program, judicial review of that agency's actions proceeds along well-established principles.  In Chevron, the Supreme Court set out the requisite two-step inquiry.  The reviewing court must first determine

> whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.

Id. at 842-43.  If Congress has not directly addressed the precise matter at issue, then "the question for the court is whether the agency's answer is based on a permissible construction of the statute."  Id. at 843.  In determining whether a ruling is permissible, the court cannot conduct a de novo investigation.  Instead, the court must defer to the agency's construction "unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned."  Id. at 845 (quoting United States v. Shimer, 367 U.S. 374, 382 (1961)).

Analysis therefore begins with the language of the statute.  We must determine whether the plain meaning of the statute speaks to the precise question at issue, viz. whether the Commission's eighteen-month contract for waste disposal satisfies § 2021e(d)(2)(B)(iv)'s requirement that a state provide for the disposal of "all" its LLRW.  Section 2021e(d)(2)(B)(iv) reads:

> (iv) The twenty-five percentum of any amount collected by a State under paragraph (1) for low-level radioactive waste disposed of under this section during the period beginning January 1, 1990 and ending December 31, 1992, and transferred to the Secretary under subparagraph (A), shall be paid by the Secretary in accordance with subparagraph (D) if, by January 1, 1993, the State in which such waste originated (or its compact region, where applicable) is able to provide for the disposal of all low-level radioactive waste generated within such State or compact region.

42 U.S.C. § 2021e(d)(2)(B)(iv) (emphases and footnotes added).

The crucial word in this passage is "all."  The Commission contends that a contract to dispose of all waste for an eighteen-month period meets the plain meaning of the January 1, 1993, milestone.  The Secretary believes that neither the Act itself nor the legislative history directly resolves the issue.  Nevertheless, based on congressional intent, legislative history, and the statutory scheme as a whole, the Secretary interpreted the provision as requiring the ability to dispose of all waste over a three-year period from January 1, 1993, until January 1, 1996.  See Surcharge Rebates:  Notice of Response to Comments of

Draft Policies and Procedures, and Final Policies and Procedures, 59 Fed. Reg. 15188, 15191 (1994).

Chevron dictates that we begin by exploring the plain meaning of the Act to see if it speaks directly to this disagreement. In determining plain meaning, we start with the text of the provision itself. In re Segal, 57 F.3d 342, 345 (3d Cir. 1995). "Where . . . the statute's language is plain, 'the sole function of the court is to enforce it according to its terms.'" United States v. Ron Pair Enter., 489 U.S. 235, 241 (1989) (quoting Caminetti v. United States, 242 U.S. 470, 485 (1917)).

The district court held that "[t]he explicit language of the Act does not support the Secretary's position." District Ct. Op. at 10. It later added, "[h]owever, we also do not find that Congress has expressly spoken in opposition to the Secretary's interpretation." Id. at 11 n.11. The district court also commented that "the pertinent language of the Act could be more explicit." Id. We interpret these findings as expressing a holding that the statutory language is ambiguous. After our own independent inquiry, we agree. The plain meaning of the Act does not speak to the precise question at issue.

The first prong of Chevron turns on the text of the provision, in this case on the implications of the adjective "all." This term is not defined in § 2021b's list of definitions. Common usage, however, provides a measure of insight. The Random House Dictionary of the English Language(1983), offers the following as the first two definitions for the term's adjectival form: "1. the whole of (used in referring to quantity, extent, or duration): all the cake; all the way; all year. 2. the whole number of (used in referring to individuals or particulars, taken collectively): all men." Id. at 38. Black's Law Dictionary (5th ed. 1979) offers similar formulations. "All. Means the whole of--used with a singular noun or pronoun, and referring to amount, quantity, extent, duration, quality, or degree. The whole number or sum of--used collectively, with a plural noun or pronoun expressing an aggregate." Id. at 68.

There can be little doubt that these definitions capture the sense in which the LLRW Act uses the word, particularly in the phrase "all . . . waste." Waste is a singular, collective noun. The adjective "all" may refer to the entirety of that waste whether it be in quantity or in duration.

We must determine whether in the LLRW Act the use of "all" refers only to quantity or whether it also incorporates duration. The Commission believes that to satisfy its obligation, it merely had to be able on January 1, 1993, to dispose of all its waste without any requirement of future capacity. The Secretary believes that "all" includes aspects of duration, judged by the ability to dispose of waste over a three-year period from January 1, 1993, until January 1, 1996. Given the lack of an explicit statutory definition of "all," we believe that the plain meaning of the statute is ambiguous.

Having found an ambiguity, our next task under Chevronis to determine "whether the agency's answer is based on a

permissible construction of the statute." 467 U.S. at 843. We stress once again that the reviewing court must not conduct an independent inquiry. "The court need not conclude that the agency construction was the only one it permissibly could have adopted . . ., or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." Id. at 843 n.11. A far more deferential standard is appropriate.

As the Supreme Court has described it, the judiciary's task in such circumstances is "to defer to [the agency's] view unless the legislative history or the purpose and structure of the act clearly reveal a contrary intent on the part of Congress." Chemical Mfrs. Ass'n v. Natural Resources Defense Council, Inc., 470 U.S. 116, 126 (1985). As we have framed the test, we must determine "whether the regulation harmonizes with the plain language of the statute, its origin, and purpose. So long as the regulation bears a fair relationship to the language of the statute, reflects the views of those who sought its enactment, and matches the purpose they articulated, it will merit deference." Sekula v. F.D.I.C., 39 F.3d 448, 452 (3d Cir. 1994); see also Director, Office of Workers' Compensation, U.S. Dept. of Labor v. Eastern Associated Coal Corp., 54 F.3d 141 (3d Cir. 1995) (applying Sekula's formulation).

We therefore turn to the legislative history and purpose of the statute to determine whether they clearly reveal a contrary intent. Quite the opposite, our review of these sources indicates that if anything, they support the Secretary's interpretation. Both the history and purpose of the statute suggest that "all" includes a durational aspect.

As noted in Part I, supra, the LLRW Act was passed to address a "nationwide crisis in low-level radioactive waste disposal." S. Rep. No. 199, 99th Cong., 1st Sess. 4 (1985). The central purpose of the LLRW Act was to encourage the development of new LLRW disposal facilities. H.R. Rep. No. 314, 99th Cong., 1st Sess., pt. 2, at 55 (1985), reprinted in 1985 U.S.C.C.A.N. 3002, 3030. The Act's selection of incentives and penalties was "an essential element of any solution to the serious problem now facing the States in the unsited regions." S. Rep. No. 199, 99th Cong., 1st Sess 4 (1985). By passing the 1985 Act, Congress sought to remedy the difficulties that had rendered the 1980 legislation ineffective. By encouraging the development of new storage space, Congress sought to avoid yet another LLRW crisis.

The goal of encouraging the construction of new facilities reveals Congress's desire for a long-term solution. This purpose is manifested in the structure of the Act, particularly in its series of progressive milestones. These milestones proceeded in graduated fashion, encouraging states to move from a basic intent to create a facility, through the planning stage, to arrive in 1993 with licensed, operational facilities. Although states could meet the milestones by contracting with facilities in other states or with other compacts, the incremental structure of the provisions shows a clear intent to promote the construction of new facilities. Indeed, it is impossible to conclude otherwise, knowing that the original 1980 Act was passed due to the inadequacy of existing

storage facilities and that the revised 1985 Act was passed to spur construction through a program of incentives.  It is ludicrous to think that Congress envisioned short-term contracts with the already existing Barnwell facility as the preferred solution to the national LLRW problem.

Other provisions of the Act similarly manifest the legislature's desire for a long-term solution.  The allowable surcharge for disposal was designed to increase steadily, doubling from $10 per cubic foot in 1986 and 1987 (the period of the first and second milestones) to $20 per cubic foot in 1988 and 1989 (the period of the third milestone), then doubling again to $40 per cubic foot between 1990 and 1992 (the period leading up to the final milestone).  42 U.S.C. § 2021e(d)(1).  These surcharges could increase by additional multipliers if a state had failed to comply with previous milestones.  Id. § 2021e(e)(2)(A)-(D).  Rebate money that the states received for meeting milestones could only be used for specific purposes, such as the establishment of LLRW disposal facilities, mitigation of LLRW disposal facility effects, regulation of LLRW disposal facilities, or the decommissioning of existing LLRW disposal facilities.  Id. § 2021e(d)(2)(E).  The entire structure of the incentive program was aimed at encouraging the construction of new, long-term facilities.

Given this statutory scheme, purpose, and legislative history, it seems clear that the Secretary's interpretation of the term "all" to include a durational aspect "bears a fair relationship to the language of the statute, reflects the views of those who sought its enactment, and matches the purpose they articulated."  Sekula v. F.D.I.C., 39 F.3d at 452.  There is certainly no evidence of a "contrary intent on the part of Congress."  Chemical Mfrs. Ass'n, 470 U.S. at 126.

Our conclusion is consistent with the specific terms of the Secretary's interpretation.  The Act provides that states are to receive a surcharge rebate for being able to dispose of "all" waste by January 1, 1993, and this rebate has to be awarded within thirty days of the milestone's achievement.  42 U.S.C. § 2021e(e)(1)(F).  The Secretary consequently needed a definite standard for applying the final milestone's indefinite requirement.

On March 31, 1994, the Department of Energy published a regulation entitled "Surcharge Rebates:  Notice of Response to Comments on Draft Policies and Procedures, and Final Policies and Procedures."  59 Fed. Reg. 15188 (1994).  This regulation noted that "[t]he Act does not explicitly define the term 'provide for the disposal of all' LLRW."  Id. at 15189.  After exploring the legislative history and statutory scheme, and after examining the text of § 2021e(d)(2)(C), the Secretary concluded that "for complete, lump-sum rebate eligibility, the States or their compact regions must have provided for disposal capacity for the entire 36-month period between January 1, 1993, and January 1, 1996."  Id. at 15191.

To conclude that the Secretary's interpretation is permissible, we need look no further than related sections of the Act.  While § 2021e(d)(2)(B)(iv) discusses the payments a state

earns for successfully meeting the final statutory milestone, the very next subparagraph, § 2021e(d)(2)(C), addresses a state's failure to meet the January 1, 1993, deadline.  It seems obvious that these two sections work together; the rewards are followed by the penalties.  The consecutive subparagraphs must be read together to create a unified statutory scheme.

Section 2021e(d)(2)(C) provides that "[i]f, by January 1, 1993, a State . . . is unable to provide for the disposal of all such waste . . . " that state must pay the surcharge rebate that it would have received for compliance to the generators from whom the surcharge was collected.  42 U.S.C. § 2021e(d)(2)(C)(ii).  The details of the repayment of the surcharge to waste generators have important implications for this dispute.

Section 2021e(d)(2)(C)(ii) states that repayments to the generators are to be made on a monthly basis with each payment equal to one thirty-sixth of the total amount to be repaid.  These payments continue "until the State . . . is able to provide for the disposal of all such waste . . . or until January 1, 1996, whichever is earlier."  Id.  Section 2021e(d)(2)(C) further provides that any state that achieves the ability to dispose of all waste at any time after January 1, 1993, and prior to January 1, 1996, will receive its lump sum rebate, but "[t]hat such payment shall be adjusted to reflect the remaining number of months between January 1, 1993 and January 1, 1996 for which such State . . . provides for the disposal of such waste."  Id. at § 2021e(d)(2)(C).  The balance of the amount is paid to the generator.

Section 2021e(d)(2)(C) thus creates an evaluatory window spanning the three years from January 1, 1993, until January 1, 1996.  States have the duty to provide for disposal of all waste indefinitely, but they are judged based on their success during this clearly defined time period.  Under the provision, a state that fails to meet the disposal requirement receives a rebate proportional to the amount of time during this three-year period for which it did successfully meet the requirement.

The case before us presents a scenario opposite to the one described above in which a state first fails to meet the requirement and then succeeds.  In the current case, the Commission succeeded for the first half of the designated period and then failed.  These two situations are symmetrical, and the Secretary believed that they should be treated symmetrically.  In other words, she concluded that, when §§ 2021e(d)(2)(B)(iv) and 2021e(d)(2)(C) are read together, they establish a three-year period of assessment during which a state is tested for its ability to provide for disposal of "all" waste.  The state should receive a rebate proportional to the duration of the three-year period during which it was able to meet the standard.

This interpretation meets the second prong of Chevron. It provides a method of measuring state compliance that "bears a fair relationship to the language of the statute, reflects the views of those who sought its enactment, and matches the purpose they articulated."  Sekula v. F.D.I.C., 39 F.3d at 452.  Indeed,

we believe that this interpretation is so well supported as to venture beyond the merely permissible.  In our view, the Secretary was correct.  A permissible interpretation, however, is all that Chevron requires.

                                    IV.

Having held the Secretary's interpretation permissible under the second prong of Chevron, our inquiry is at an end.  The district court, however, came to two further conclusions that could provide independent support for its entry of summary judgment in favor of the Commission.  We will address them briefly.

First, the district court held the Secretary's interpretation of the Act procedurally invalid, claiming that the Secretary failed to comply with the Administrative Procedure Act's requirements for notice and comment rule-making, 5 U.S.C. §§ 533(b) & (c).  This conclusion was incorrect as a matter of law.

The Secretary's ruling was interpretative, and interpretive rules are exempt from notice and comment procedures pursuant to 5 U.S.C. § 553(b)(3)(A).

> Interpretive rules constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.  Interpretive rules are not intended to alter legal rights, but to state the agency's view of what existing law requires.  Such rules "merely clarify or explain existing law or regulations."

Sekula, 39 F.3d at 457 (quoting Southern Cal. Edison Co. v. F.E.R.C., 770 F.2d 779, 783 (9th Cir. 1985)).  "If the rule in question merely clarifies or explains existing law or regulations, it will be deemed interpretive."  Bailey v. Sullivan, 885 F.2d 52, 62 (3d Cir. 1989).  A rule is also interpretive if the statutory scheme would have been fully operative without the regulations and the regulation merely published standards to be used in agency adjudication.  American Mining Congress v. Mine Safety & Health Admin., 995 F.2d 1106, 1108-09 (D.C. Cir. 1993).

These descriptions characterize the Secretary's action in the current case.  The LLRW Act imposed the obligation to dispose of "all . . . waste."  The Secretary's notice simply publicized the standards she intended to use when applying § 2021e(d)(2)(B)(iv), clarifying her view of what existing law required.  In addition, the Secretary had the power to make payment determinations in her role as trustee of the escrow account pursuant to § 2021e(d)(2)(A).  She would therefore have made these decisions even if she had not publicized her standards in the Federal Register.  As such, her ruling was interpretive and exempt from notice and comment requirements.

The district court also held the Secretary's position procedurally invalid as an instance of retroactive rulemaking. The court reached this conclusion largely because it believed that the Secretary's 1994 publication of her interpretation promulgated a new rule that could not be applied to a contract

formed in 1992. Retroactive rulemaking is presumptively impermissible, see Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988); see also Landgraf v. USI Film Products, 511 U.S. 244, ___, 114 S. Ct. 1483, 1505 (1994), but retroactivity concerns are irrelevant to this case. The Secretary's ruling was interpretive. It therefore did not alter existing rights or obligations; it merely clarified what those existing rights and obligations had always been. See Manhattan Gen. Equip. Co. v. Commissioner, 297 U.S. 129, 135 (1936) (explaining that agency rule interpreting a statute "is no more retroactive in its operation than a judicial determination construing and applying a statute to a case in hand"). As a result, her interpretation had no prohibited retroactive impact.

## V.

Congress passed the LLRW Act to address the nation's recurring problems with nuclear waste. Congress sought to address the problem through the construction of new disposal facilities, spurred by a carefully crafted series of incentives and standards. These standards culminated in a requirement that states be able to dispose of "all" waste. In the seven years it had to prepare to meet Congress's 1985 requirements and in the twelve years it had to meet the 1980 requirements, the Commission failed to develop any options beyond a short-term contract with one of the nation's original facilities. The Secretary evaluated the sufficiency of this contract based on a permissible reading of the Act and found it wanting. Under Chevron, this court cannot substitute its judgment for the Secretary's. We will therefore reverse the district court's decision and remand with instructions to enter judgment for the Secretary.