

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-18-1997

# Appalachian States v. Secretary Energy

Precedential or Non-Precedential:

Docket
95-7382

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Appalachian States v. Secretary Energy" (1997). *1997 Decisions.* Paper 221.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/221

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 18, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 95-7382

APPALACHIAN STATES LOW-LEVEL RADIOACTIVE
WASTE COMMISSION

v.

HON. FEDERICO PENA,1 in his official capacity as
Secretary of Energy,

        Appellant

ON PETITION FOR PANEL REHEARING

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSLYVANIA
(D.C. No. 94-cv-1033)

Argued: February 9, 1996
Reargued: May 21, 1997

Before: BECKER, ROTH, and MCKEE, Circuit Judge s.

(Filed September 18, 1997)

_____

1. Pursuant to Fed. R. App. P. 43(c), Federico Pena has been substituted
as a party for Hazel O'Leary whom he succeeded as the Secretary of
Energy.


        Frank W. Hunger, Esq.
        Assistant Attorney General
        U.S. Department of Justice
        Civil Division, Rm. 3127
        950 Pennsylvania Avenue, N.W.
        Washington, DC 20530-0001

        David M. Barasch, Esq.
        United States Attorney
        U.S. Department of Justice
        Civil Division, Rm. 3127
        950 Pennsylvania Avenue, N.W.
        Washington, DC 20530-0001

Mark B. Stern, Esq.
Assistant United States Attorney
U.S. Department of Justice
Civil Division, Rm. 3127
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Michael S. Raab, Esq. (Argued)
Assistant United States Attorney
U.S. Department of Justice
Civil Division, Rm. 3127
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Mary C. Frye, Esq.
Office of United States Attorney
Federal Building
228 Walnut Street
P.O. Box 11754
Harrisburgh, PA 17108

 Attorneys for Appellant

John W. Carroll, Esq. (Argued)
Pepper, Hamilton & Scheetz
200 One Keystone Plaza
P.O. Box 1181
Harrisburg, PA 17108-1181

Timothy B. Anderson, Esq.
Pepper, Hamilton & Scheetz
200 One Keystone Plaza
P.O. Box 1181
Harrisburg, PA 17108-1181

Brian P. Downey, Esq.
Pepper, Hamilton & Scheetz
200 One Keystone Plaza
P.O. Box 1181
Harrisburg, PA 17108-1181

David Richman, Esq.
Pepper, Hamilton & Scheetz
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103-2799

 Attorneys for Appellee

OPINION OF THE COURT

McKEE, Circuit Judge.

This is the second time this dispute has come before this panel. The first time, then-Secretary of Energy Hazel O'Leary appealed the district court's grant of summary judgment to the Appalachian States Low-Level Radioactive Waste Commission2 ("the Commission") in the mandamus action the Commission had filed in an attempt to compel the Secretary to release all funds that had been escrowed

_____

2. Pursuant to the Low-Level Radioactive Waste Policy Amendments Act of 1985, the states of Pennsylvania, Delaware, Maryland, and West Virginia formed a compact to collectively dispose of the low-level radioactive waste generated in their region.

pursuant to the Low-Level Radioactive Waste Policy Amendments Act of 1985,3 42 U.S.C. S 2021b et seq. At issue was whether the Commission had provided for the disposal of "all" its low-level radioactive waste by January 1, 1993, one of the milestone dates established under that statute. We concluded that the term "all" in the statute was ambiguous and that the Secretary's interpretation of that term was reasonable4 and thus entitled to deference. Accordingly, we reversed the district court's grant of summary judgment to the Commission and remanded the case with instructions to enter judgment for the Secretary. See Appalachian States Low-Level Radioactive Waste Comm'n v. O'Leary, 93 F.3d 103 (3d Cir. 1996).

The parties come before us now on the Commission's petition for rehearing of our earlier decision. Specifically, the Commission asks us to consider a fact that arose after the district court's decision, namely, South Carolina's withdrawal from the Southeast Compact and the subsequent reopening of the Barnwell waste-disposal facility in July 1995. Because of South Carolina's withdrawal from the Southeast Compact, the Dormant Commerce Clause operated to prohibit that state from discriminating against waste generated outside its borders. Consequently, the Commission amended its policy to authorize and encourage its generators within the Appalachian region to export their low-level waste to facilities like Barnwell. The Commission claims that, in this way, it "provided for" the disposal of all low-level radioactive waste generated by the Appalachian states between July

_____

3. Under that Act, a state or compact that met certain milestone dates would receive incentive payments from an escrow account funded by surcharges imposed on waste generators and held in trust by the Secretary of Energy.

4. Then-Secretary O'Leary "explained that a full 1993 rebate would be given only to those states that had provided for disposal of all their waste for the entire three-year period from January 1, 1993, until January 1, 1996." Appalachian States Low-Level Radioactive Waste Comm'n v. O'Leary, 93 F.3d 103, 107 (3d Cir. 1996). Although the Commission had entered a contract for the disposal of its waste by January 1, 1993, that contract only covered half of the relevant three-year period, and therefore the Commission was only entitled to half of the rebate.

4

1995 and January 1996. Accordingly, the Commission now seeks a proportional rebate for this period. The Secretary, however, contends that "provide for" does not mean "permit," and, because the Commission merely"permit[ted] its generators to export their waste to South Carolina" for the last six months of 1995, it is not entitled to that rebate. Answer To Pet. at 3.

For the reasons explained below, we will enter judgment for the Secretary.

I.

The circumstances that gave rise to the instant dispute are set forth in our earlier decision in this case, see Appalachian Comm'n, 93 F.3d at 105-07, and the Supreme Court's decision in New York v. United States , 505 U.S. 144 (1992)(invalidating the take-title provision of the 1985 Act). Therefore, we present only those facts necessary for a complete understanding of the this appeal.

In 1985, Congress passed the Low-Level Radioactive Waste Policy Amendments Act, 42 U.S.C. S 2021b et seq. (the "Act"), which created various incentives to encourage states without low-level radioactive waste disposal facilities to establish means to dispose of their low-level radioactive waste by 1992.5 "The incentives included an escalating

_____

5. The Act was designed to address the crisis that developed following the enactment of its predecessor act, the Low-Level Radioactive Waste Policy Act of 1980. In the 1980 Act, "Congress declared a federal policy of holding each State `responsible for providing for the availability of capacity either within or outside the State for the disposal of low-level

radioactive waste generated within its borders,' and found that such waste could be disposed of `most safely and efficiently . . . on a regional
basis.' " New York v. United States, 505 U.S. at 150. To effectuate that policy, "[t]he 1980 Act authorized States to enter into regional compacts that, once ratified by Congress, would have the authority beginning in 1986 to restrict the use of their disposal facilities to waste generated within member States." Id. Compacts formed around the three disposal facilities then in existence leaving approximately thirty-one states that, beginning in 1986, would be without an outlet for their low-level radioactive waste. Faced with this prospect, Congress passed the Low-Level Radioactive Waste Policy Amendments Act of 1985.

scale of surcharges, which states with sites could charge for [low-level radioactive] waste disposal and a rebate system to return a portion of those surcharges to states that met the relevant milestones." Appalachian Comm'n, 93 F.3d at 106.6
At issue here is one of the Act's several monetary incentives, specifically, the incentive payment pursuant to the fourth provision of the "Milestone incentives." See 42 U.S.C. S 2021e(d)(2)(B)(iv). That provision states that

> twenty-five per centum of any amount collected by a State under paragraph (1)[as surcharges] for low-level radioactive waste disposed of under this section during the period beginning January 1, 1990 and December 31, 1992, and transferred to the Secretary under subparagraph (A)[into an escrow account held in trust by the Secretary], shall be paid [to a state] . . . if, by January 1, 1993, the State in which such waste originated (or its compact region, where applicable) is able to provide for the disposal of all low-level radioactive waste generated within such State or compact region.

42 U.S.C. S 2021e(d)(2)(B)(iv). To comply with this milestone, a state or compact "could provide for disposal by either operating a disposal facility or pointing to a valid contract with another state or compact for disposal of the region's waste." Central Midwest Interstate Low-Level Radioactive Waste Comm'n v. Pena, 113 F.3d 1468, 1471 (7th Cir. 1997). However, the "full 1993 rebate would be given only to those states that had provided for disposal of all their waste for the entire three-year period from January 1, 1993, until January 1, 1996. States that only provided for disposal for shorter periods would have their rebates reduced proportionately."7 Appalachian Comm'n, 93 F.3d at 107.

_____

6. "States that failed to meet the milestones would forfeit these rebates, would face higher surcharge rates, and could be barred from disposing of their waste at a given facility." Appalachian Comm'n, 93 F.3d at 106.

7. We previously held that the Appalachian Commission was not entitled to a full rebate because it had only "entered an eighteen-month conditional contract with the Southeast Compact to obtain access to the disposal facility in Barnwell, South Carolina" and thus could not provide for the disposal of all of its waste for the entire period between January 1, 1993 and January 1, 1996. Appalachian Comm'n, 93 F.3d at 106. The contract was not renewed, and the Commission did not contract with another compact region. Accordingly, the Commission was only entitled to half of the escrowed funds.

6

Six months prior to the end of the three-year period, South Carolina withdrew from the Southeast Compact. As a result, the Dormant Commerce Clause operated to prohibit that state from discriminating against waste from outside its region. "The dormant aspect of the Commerce Clause `prohibits economic protectionism--that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.' " Tolchin v. Supreme Court of New Jersey, 111 F.3d 1099, 1106 (3d Cir. 1997). Once it withdrew from the Southeast Compact, South Carolina "waived its rights under the [Act] to exclude waste from outside the region," Midwest Interstate Low-Level Radioactive Waste Comm'n v. O'Leary, 926 F. Supp. 134, 136 n.2 (D. Minn. 1996), thereby making the Barnwell disposal facility in that state available to the generators within the Appalachian region.

On July 27, 1995, the Commission amended its export policy to authorize and encourage the disposal of waste from the Appalachian region at any licensed facility, including Barnwell. Generators in the Appalachian region, therefore, could contract for disposal of their waste at Barnwell for the last six months of 1995. The Commission itself did not negotiate or enter a new contract with South Carolina covering this period. Nevertheless, the Commission contends that it "provided for" the disposal of the low-level radioactive waste generated in its region for the last six months of 1995 and thus is entitled to a proportional rebate of the escrowed funds. The Commission now asks us to remand this case to the district court so that it can consider its claim in the context of the reopening of the Barnwell facility to generators outside of South Carolina. However, since the facts are not in dispute, we will decide the Commission's legal entitlement to the remaining funds without remand to the district court.

II.

"As a general rule, we do not consider on appeal issues that were not raised before the district court." Tabron v. Grace, 6 F.3d 147, 153 n.2 (3d Cir. 1993); see also Harris v. City of Philadelphia, 35 F.3d 840, 845 (3d Cir. 1994); Selected Risks Ins. Co. v. Bruno, 718 F.2d 67, 69 (3d Cir.

1983); Franki Found. Co. v. Alger-Rau & Assocs. , 513 F.2d 581, 586 (3d Cir. 1975); O'Neill v. Ambrose-Augusterfer Corp., 411 F.2d 139, 143-44 (3d Cir. 1969). This rule, however, "is one of discretion rather than jurisdiction, and in the past we have heard issues not raised in the district court when prompted by exceptional circumstances," Selected Risks, 718 F.2d at 69, or "whenever the public interest or justice so warrants," Franki Found., 513 F.2d at 586. We believe that the public interest is sufficiently implicated here to require resolution of the issue raised in the Commission's petition without remanding this case to the district court.

III.

Once again, we are asked to evaluate the Secretary of Energy's interpretation of the Low-Level Radioactive Waste Policy Amendments Act under the standard set forth in Chevron, U.S.A. v. Natural Resources Defense Council , 467 U.S. 837 (1984). More specifically, we are asked to consider the Secretary's interpretation of "provide for" in sections 2021e(d)(2)(B)(iv) and 2021e(d)(2)(C) of that Act. As noted above, section 2021e(d)(2)(B)(iv) states that twenty-five percent of the surcharges held in escrow shall be paid to the state "if, by January 1, 1993, the State in which such waste originated (or its compact region, where applicable) is able to provide for the disposal of all low-level radioactive waste generated within such State or compact region." 42 U.S.C. S 2021e(d)(2)(B)(iv) (emphasis added)."If a State (or, where applicable, a compact region) in which low-level radioactive waste is generated provides for the disposal of such waste at any time after January 1, 1993 and prior to January 1, 1996, such State (or, where applicable, compact region) shall be paid . . . a lump sum . . . adjusted to reflect the . . . months between [that period] for which such State (or, where applicable, compact region) provides for the disposal of such waste." 42 U.S.C. S 2021e(d)(2)(C) (emphasis added).

The Commission claims it is entitled to a proportional rebate pursuant to these provisions for the last six months of 1995 when the Barnwell facility became accessible to its generators through the Dormant Commerce Clause.

Following Barnwell's reopening, the Commission amended its export policy to authorize and encourage its generators to dispose of their waste at that facility. However, as noted above, the Commission did not itself negotiate or enter a contract with Barnwell for this six-month period. Instead, the generators were left to do so on their own. The Secretary of Energy contends that this arrangement did not satisfy the Act's requirement that a state "provide for the disposal of all low-level radioactive waste generated within such State or compact region." 42 U.S.C. S 2021e(d)(2)(B)(iv). According to the Secretary, "provide for" does not mean "permit." Instead, that phrase implies "some meaningful affirmative action . . . to facilitate the disposal of [the] region's [low-level radioactive waste]." Resp. To Rely at 2-3. That interpretation is at issue here.

The one court of appeals that has decided this issue upheld the Secretary's interpretation of "provide for" as reasonable. See Central Midwest Interstate Low-Level Radioactive Waste Comm'n v. Pena, 113 F.3d 1468 (7th Cir. 1997). There, the Central Midwest Commission8 sent a letter to the Secretary after the Barnwell facility reopened demanding a rebate for the period July 1, 1995 through December 31, 1995 "claim[ing] it was entitled to the cash because it had provided for disposal by allowing generators to ship their waste to [that facility]." 9 Id. at 1472. The Secretary of Energy disagreed reasoning that "provide for" required more than "simply permit[ting] generators to export their waste." Id. The commission then sued in the district court to recover the escrowed funds. That court entered summary judgment in favor of the Secretary, and the commission appealed.

_____

8. This commission is comprised of Illinois and Kentucky.

9. Like the Appalachian Commission, the Central Midwest Commission had entered into an 18-month contract with the Southeast Compact that guaranteed access to the Barnwell disposal facility in South Carolina. That contract lapsed on June 30, 1994. During the period between that lapse and the reopening of the Barnwell facility, the generators stored their waste. After Barnwell reopened, they claimed they could send this stored waste to the reopened facility and therefore sought a refund for the entire period July 1, 1994 through June 30, 1995 as well.

The Seventh Circuit Court of Appeals agreed with the Secretary's position and found that the commission had done nothing to "supply, afford, contribute, make, procure, or furnish for future use" means to dispose of low-level radioactive waste. Id. at 1474. The commission asserted, however, that the decision to lift its compact's export ban together with the Barnwell facility's reopening"provided for" the disposal of the Central Midwest region's low-level radioactive waste. The court, however, considered this reasoning flawed because "South Carolina--not the Commission--made th[e] call [to reopen Barnwell], and the fourth milestone clearly states that a compact is entitled to incentives only when the compact provides for disposal." Id. Accordingly, that court affirmed the district court's grant of summary judgment to the Secretary. We reach a similar result here based upon the plain language of the statute.

IV.

"When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. . . . If, however, the court determines Congress has not directly addressed the precise question at issue, . . . the question for the court is whether the agency's answer is based on a permissible construction of the statute." Chevron, 467 U.S. at 842-43.

Because the Act does not define the phrase "provide for," see 42 U.S.C. S 2021b ("Definitions"), we begin by considering the statute's plain meaning. See Smith v. Fidelity Consumer Discount Co., 898 F.2d 907, 909 (3d Cir. 1990)("We begin with the familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself." (quoting Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc. , 447 U.S. 102, 108 (1980))); see also Ries v. National R.R. Passenger Corp., 960 F.2d 1156, 1161 (3d Cir. 1992)(same). "In construing statutes, `we must, of course, start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used.' " Id. (quoting INS v. Elias-Zacarias, 502 U.S. 478, 482 (1992)). The ordinary

10

meaning of "provide" is "[t]o make, procure, or furnish for future use, prepare" as well as "[t]o supply; to afford; to contribute." BLACK'S LAW DICTIONARY 1224 (6th ed. 1990). Other definitions of "provide" include: "1: to take precautionary measures"; "2: to make a proviso or stipulation"; "3: to make preparation to meet a need"; "1

archaic: to prepare or get ready in advance"; and "2a: to supply or make available . . . b: to make something available to." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 948 (1990); see also WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1827 (1971)(same).

The disputed language in the Act is not ambiguous. Thus, our statutory interpretation is at an end, and we must give that language effect. See Chevron, 467 U.S. at 842-43 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."); Smith, 898 F.2d at 910 (same). Its plain meaning clearly suggests that, before a state or compact may receive a rebate under the Act, it must take some affirmative step to supply, afford, or furnish means to dispose of its waste. That is not what the Commission did. Here, the Commission took no meaningful affirmative action. It did not construct a disposal facility, take title to its region's low-level radioactive waste, or enter into a disposal contract. The Commission has yet to even select a site for its disposal facility, let alone complete its construction.

Accordingly, the Commission, is not entitled to a proportional rebate for the last six months of 1995. See Central Midwest Comm'n, 113 F.3d at 1474 (concluding that the Central Midwest Commission had not "provided for" the disposal of its low-level radioactive waste)("After its Barnwell contract expired the Commission did not supply, afford, contribute, make, procure or furnish anything related to the disposal of the region's waste. Rather, the Commission sat back and let fate run its course."); Midwest Comm'n, 926 F. Supp. at 136 (concluding that the Midwest Commission had not "provided for" the disposal of its low-level radioactive waste)("[The commission's argument to the contrary] strains the ordinary and natural meaning of these

11

terms, since the Midwest Commission has merely permitted disposal in South Carolina.").

V.

Even if "provide for" were ambiguous, we would reach the same result because we believe the Secretary's interpretation of that phrase is consistent with the policy statements issued by the Department of Energy. We have previously held that we owe substantial deference to an agency's policy position. See Elizabeth Blackwell Health Ctr. for Women v. Knoll, 61 F.3d 170, 183 (3d Cir. 1995)("We

must give substantial deference to an agency's construction of its own regulation."), cert. denied, 116 S. Ct. 816 (1996). Here, the Secretary sent out final notices of response to comments on the draft procedures and policies previously published and issued a final policy statement on the subject. That policy statement explains that, in addition to constructing a new disposal facility,

> one demonstration of the ability to provide for the disposal of all LLRW generated within a State or compact region would be the existence of an enforceable contract for disposal with a sited State or region. A second demonstration would be that generators are in fact provided with the ability to dispose of their waste under a contractual arrangement between their State or compact region and a sited State or region, even if that contract were not by its terms enforceable.

Surcharge Rebates: Notice of Response to Comments on Draft Policies and Procedures, and Final Policies and Procedures, 59 Fed. Reg. 15188, 15189 (1994). Alternatively, a state provides for the disposal of such waste if it "takes title, possession, and liability for the waste [it generates]." 59 Fed. Reg. at 15194.

The Secretary is asserting this same "policy" as its position in the instant litigation. No deference is due an agency's litigation position. See United States v. Trident Seafoods Corp., 60 F.3d 556, 559 (9th Cir. 1995)("No deference is owed when an agency has not formulated an official interpretation of its regulation, but is merely

12

advancing a litigation position."); Idaho Dep't of Health & Welfare v. United States Dep't of Energy, 959 F.2d 149,153 (9th Cir. 1992)(same). However, here, we would not be deferring to the agency's litigation position, but to the prior policy statement that happens to be consistent with it. Moreover, the consistency between the Secretary's position in this litigation and the prior policy statements issued by the Department of Energy suggests that the usual justifications for not deferring to agency counsel's litigation position--that the position does not reflect the view of agency heads or was developed hastily by agency counsel-- are absent. See Federal Labor Relations Auth. v. United States Dep't of Treasury, 884 F.2d 1446, 1455 (D.C. Cir. 1989)(identifying these basic justifications for courts' reluctance to defer to agency counsel's litigation position); see also Skandalis v. Rowe, 14 F.3d 173, 179 (2d Cir. 1994)(suggesting that a position taken during litigation that

is consistent with an agency's earlier position is a "factor in determining whether deference is appropriate"). Thus, if the statute were ambiguous, we would afford the same treatment to the Secretary's position here that we would a more formal agency interpretation.

Accordingly, we would uphold the Secretary's construction if it " `[were] based on a permissible construction of the statute.' " Smith, 898 F.2d at 910 (quoting Chevron, 467 U.S. at 843). In making that determination, we must decide " `whether [that position] harmonizes with the plain language of the statute, its origin, and purpose. So long as the [interpretation] bears a fair relationship to the language of the statute, reflects the views of those who sought its enactment, and matches the purpose they articulated, it will merit deference." Appalachian Comm'n, 93 F.3d at 110 (quoting Sekula v. F.D.I.C., 39 F.3d 448, 452 (3d Cir. 1994)).

As stated earlier, the Act was enacted to address the "crisis" that followed the passage of the original Low-Level Radioactive Waste Policy Act of 1980. Although the 1980 Act declared that states should assume responsibility for the disposal of their low-level radioactive waste, in the five years after the Act's passage, no new disposal facilities had been constructed or were projected to be completed before

the 1990s. Yet, under the Act, the three facilities then in existence could begin excluding waste generated outside their region beginning in 1986. All three states had expressed an unwillingness to shoulder the entire nation's low-level radioactive waste disposal beyond that time. This situation "trigger[ed] a national emergency with grave implications for the public's health and safety." H. Rep. No. 314(II), 99th Cong., 1st Sess. (1985), reprinted in 1985 U.S.C.C.A.N. 3002, 3007. Faced with the prospect that a majority of states would be without access to a waste disposal facility, Congress enacted the Low-Level Radioactive Waste Policy Amendments Act of 1985.

That Act extended states' access to the existing facilities until 199210 and included several milestones and monetary incentives to encourage the construction of new facilities. These features were designed "to assure that a crisis similar to the one [previously] facing Congress and the states would not recur at the end of the 1986-1992 period of access to the currently operating sites." H.R. Rep. No. 314(I), 99th Cong., 1st Sess. (1985), reprinted in 1985 U.S.C.C.A.N. 2974, 2978. The rebates were specifically intended to "provide an additional incentive for states and

compact regions to meet the milestones on time." H. Rep. No. 314(II), 1985 U.S.C.C.A.N. at 3012 (emphasis added). Indeed, we have previously stated:

> [T]he incremental structure of the provisions shows a clear intent to promote the construction of new facilities. . . . [and] it is impossible to conclude otherwise, knowing that the original 1980 Act was passed due to the inadequacy of existing storage facilities and that the revised 1985 Act was passed to spur construction through a program of incentives. It is ludicrous to think that Congress envisioned short-term contracts with the already existing Barnwell facility as the preferred solution to the national[low-level radioactive waste] problem.
>
> . . . The entire structure of the incentive program was

_____

10. In exchange, the facilities were permitted to assess graduated surcharges on outside waste.

14

> aimed at encouraging the construction of new, long-term facilities.

Appalachian Comm'n, 93 F.3d at 110-11.

Against this background, we cannot conclude that Congress intended to reward generators that are in the same position that they were in prior to the passage of the 1985 Act--when generators had access to the existing disposal facilities through operation of the Dormant Commerce Clause. That Clause merely prohibited the states with disposal facilities from discriminating against out-of-state waste. However, nothing prevented those states from imposing across-the-board limitations on the quantity of waste accepted or closing their facilities altogether. See Midwest Comm'n, 926 F. Supp. at 137 ("Before the Act, generators could dispose of waste in any facility that was open, but states could elect to close their facilities. Similarly, states could limit the total amount of waste accepted for disposal in a facility, as long as they acted without discrimination against out-of-state waste."). The same situation existed when the Barnwell facility reopened in 1985. Because it had no contracts with that facility, the Commission was only guaranteed that Barnwell would not discriminate against waste generators from the Appalachian region. The Commission otherwise had no assurances as to how much and for how long Barnwell would accept that region's waste.

We agree with the Secretary's position that to reward the Commission "for simply returning to th[is] prior regime . . . would be contrary to the purpose of the statute." Resp. To Reply at 5-6 (internal quotations omitted); see also Central Midwest Comm'n, 113 F.3d at 1474 ("[T]he Commission's interpretation leaves generators (armed only with the dormant Comm[erce] Clause) to fend for themselves, gives states and compacts absolutely no incentive to increase disposal capacity, and hinders the development of a network of fairly and evenly distributed regional disposal sites."). Under the Secretary's interpretation, a state or compact would be entitled to a rebate if it made "an affirmative effort to arrange for its generators to obtain disposal capacity during [the relevant period]." Resp. To Reply at 8. That interpretation of "provide for" is consistent

15

with the purpose of the Act. Simply authorizing generators "to fend for themselves" is not sufficient affirmative effort. Thus, even if the statute were not plain, we would defer to the Secretary's interpretation of "provide for."11

VI.

For the foregoing reasons the petition for panel rehearing is denied. The prior opinion and judgment of this Court remain in effect.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

_____

11. "[We] need not conclude that [this] construction [is] the only one [the
Secretary] permissibly could have adopted to uphold the construction, or even the reading [this Court] would have reached if the question initially had arisen in a judicial proceeding." Chevron , 467 U.S. at 843 n.11.

16